THE MECHANICS AND METALS NATIONAL BANK OF THE CITY OF NEW YORK, a Corporation, Appellant, v. D. R. PINGREE, JOHN BROCKIE, L. W. PINGREE, J. H. PETERSON, E. J. MERRILL, RICHARD DOUGLAS, W. H. HILLMAN and FRED G. CALDWELL, Respondents.

[232 Pac. 5.]

BILLS AND NOTES—SALE OF PLEDGED COLLATERAL—CONVERSION—WHEN GUARANTORS RELEASED.

1. Where a pledge agreement provides that notes pledged as collateral may be sold either at public or private sale and without advertising the same or giving notice, the waiver of notice applies only when the collateral is sold at private sale; if the pledgee elects to sell at public sale it must give the notice required by law for the sale of a pledge at public auction.

2. Where a pledgee of promissory notes held as collateral has

————

Publisher's Note.

1. Right of pledgee to sell collateral given to secure debt, see note in **Ann. Cas. 1916B**, 237.

2. Validity of private sale of pledged property, see note in 4 **Ann. Cas.** 1166.

sold the same at public sale in another state and brings an action in this state against the guarantors of the original note to recover the deficiency after the application of the proceeds of the sale of the pledged property, it must be alleged and proved that such collateral was sold in accordance with the requirements of law where such pledged property was sold, and upon failure to do so it will be presumed that the law relating to the sale of pledges at public auction is the same as the law of this state, and any substantial departure from the method prescribed by law for the sale of pledges will render the sale a conversion of the pledge to the extent of the difference between its value and what it was sold for.

3. A sale at public auction of promissory notes pledged as collateral without substantial compliance with requirements of law relating to the sale of pledges amounts to a conversion of such collateral.

4. Where a creditor holds a guaranty for the payment of an obligation and also collateral notes pledged for its payment, if it converts such collateral without the consent of the guarantors, such guaranty is released to the extent of the value of the collateral so converted, and in the absence of any evidence as to the value of such collateral it will be presumed to be worth its face value.

APPEAL from the District Court of the Fifth Judicial District, for Bannock County. Hon. Robert M. Terrell, Judge.

Action on contract of guaranty. From judgment for defendants, plaintiff appeals. *Affirmed.*

Stevens & Downing, for Appellant.

The contract of guaranty in question is a continuing guaranty of payment, and the payment of the note in question in this case was covered by the guaranty. (*Scovill Mfg. Co. v. Cassidy*, 275 Ill. 462, 114 N. E. 181; *First Nat. Bank of Litchfield, Conn., v. Jones*, 219 N. Y. 312, 114 N. E. 349; *Utica City Nat. Bank v. Gunn*, 222 N. Y. 204, 118 N. E. 607; *Peoria Savings, Loan & Trust Co. v. Elder*, 165 Ill. 55, 45 N. E. 1083; *Conduitt v. Ryan*, 3 Ind. App. 1, 29 N. E. 160; *Benton Co. Sav. Bank v. Boddicker*, 105 Iowa,

548, 67 Am. St. 310, 75 N. W. 632, 45 L. R. A. 321; *First Nat. Bank of Antigo v. Wunderlich,* 145 Wis. 193, 130 N. W. 98.)

Exhibits numbered 1 to 34, and 36 to 40, 42A, 43 to 47, inclusive, denied by the court, were admissible to show transactions leading up to the guaranty and the giving of the note, to show that credit was given on the strength of such guaranty and the circumstances under which said guaranty was given. (*Worcester Coal Co. v. Utley,* 167 Mass. 558, 46 N. E. 114; *Dunning & Smith v. Roberts,* 35 Barb. (N. Y.) 463; *Douglass v. Reynolds Byrne Co.,* 7 Pet. (U. S.) 113, 8 L. ed. 626; *Bell v. Bruen,* 1 How. (U. S.) 169, 11 L. ed. 89.)

The sale of collateral in the city of New York was valid and was authorized by the note contract between the plaintiff and the Stockgrowers Bank and Trust Company. (*In re Markell,* 276 Fed. 313; 8 C. J., sec. 149, p. 89; *Irving Nat. Bank v. Ellis,* 74 N. J. L. 42, 64 Atl. 1071; *Williams v. Parker,* 30 Cal. App. 71, 157 Pac. 550; *Hudgens v. Chamberlain,* 161 Cal. 710, 120 Pac. 422; *Dibert v. Wernicke,* 214 Fed. 673, 131 C. C. A. 109; *Citizens Bank & Trust Co. v. Thornton,* 174 Fed. 752, 98 C. C. A. 478.)

It was not necessary to notify different guarantors, defendants herein, of the time or place of the sale of collateral under the note contract between the plaintiff and the Stockgrowers Bank and Trust Company. (*Withers v. Bousfield,* 42 Cal. App. 304, 183 Pac. 855; *Williams v. Hahn,* 113 Cal. 475, 45 Pac. 815.)

The defendants, as directors, officers and stockholders of the Stockgrowers Bank and Trust Company, were estopped from questioning the return of collateral to the Stockgrowers Bank and Trust Company. (*Pruden v. Liebler,* 22 N. D. 587, 135 N. W. 186.)

Where there is any evidence at all supporting the plaintiff's cause of action it is the court's duty to submit the same to the jury. (*Utica City Nat. Bank v. Gunn,* 222 N. Y. 204, 118 N. E. 607.)

Budge & Merrill and Peterson & Coffin, for Respondents.

"Where a creditor holds a guaranty for payment of an obligation and also collateral security, if he surrenders the collateral to the debtor without the consent of the guarantor the guarantor is released to the extent of the value of the collateral so surrendered." (Brandt on Suretyship & Guaranty, secs. 480–482; *Central State Bank v. Ford,* 181 Iowa, 319, 164 N. W. 754; *Scandinavian American Bank v. Westby,* 41 N. D. 276, 172 N. W. 666; *Foerderer v. Moors,* 91 Fed. 476, 33 C. C. A. 641; *Allen v. O'Donald,* 23 Fed. 573; *Gotzian & Co. v. Heine,* 87 Minn. 429, 92 N. W. 398.)

"Where the collateral surrendered to the debtor by a creditor without consent of the guarantor consists of promissory notes, such notes, in the absence of other proof, are *prima facie* worth their face value." (*Revert v. Hessee,* 184 Cal. 295, 193 Pac. 943; *Peerless Fire Ins. Co. v. Barcus* (Tex. Civ.), 227 S. W. 368; Brandt on Suretyship & Guaranty, sec. 480.)

"In the absence of proof to the contrary, the law of another state is presumed to be the same as the law of this state." (*Moore v. Pooley,* 17 Ida. 57, 104 Pac. 898; *Maloney v. Winston Bros. Co.,* 18 Ida. 757, 111 Pac. 1086.)

"Although a pledge agreement provides that collateral may be sold at public or private sale and without advertising the same or giving notice, the waiver of notice applies only when the collateral is sold at private sale. If the pledgee elects to sell at public sale he must give the notice required by statute." (*Union Merc. Co. v. Harnwell,* 158 Ark. 295, 250 S. W. 321; *Foote v. Utah-Commercial & Savings Bank,* 17 Utah, 283, 54 Pac. 104; *Dulin v. National City Bank* (Ind. App.), 130 N. E. 426; *Amarillo National Bank v. Harrington,* 62 Tex. Civ. 179, 131 S. W. 231; *Bendel v. Crystal Ice Co.,* 82 Cal. 199, 22 Pac. 1112.)

"A sale of pledged collateral in disregard of the statute amounts to a conversion." (31 Cyc. 839; *Wigham v. Fountain,* 132 Ga. 277, 63 S. E. 1115; *Feige v. Burt,* 118

Mich. 243, 74 Am. St. Rep. 390, 77 N. W. 928; *King v. Boerne State Bank* (Tex. Civ.), 159 S. W. 433.)

"The measure of damages for conversion of promissory notes is *prima facie* the face value of the notes sold." (*Revert v. Hessee, supra; Peerless Fire Ins. Co. v. Barcus, supra; Hazzard v. Duke,* 64 Ind. 221; *Davies v. Stevenson,* 59 Kan. 648, 54 Pac. 679.)

"Conversion of pledged collateral to an amount equal to the debt whereby the debt is discharged, releases the guarantors." (28 Corpus Juris, 993, sec. 152; *Glassell v. Coleman,* 94 Cal. 260, 29 Pac. 508; *State Bank v. Edwards,* 45 N. D. 341, 177 N. W. 677; *Central State Bank v. Ford,* 181 Iowa, 319, 164 N. W. 754.)

WILLIAM A. LEE, J.—Appellant, Mechanics & Metals National Bank of New York City, is a corporation, under the national banking laws of the United States, with its principal place of business in New York. The Stockgrowers Bank & Trust Company, which will hereinafter be referred to as the Stockgrowers Bank, was a banking corporation with its principal place of business in Pocatello, Idaho. With the exception of L. W. Pingree, who was its assistant cashier, and Richard Douglas who was a stockholder, the remaining respondents were directors of the Stockgrowers Bank. It executed its note to appellant dated July 29, 1920, for fifty thousand dollars payable in ninety days. July 7th preceding the giving of this note, respondents, with John Brockie, a codefendant who defaulted and thereafter made no further appearance, executed an instrument and delivered the same to appellant which, omitting the signatures, reads as follows:

"July 7, 1920.

"For and in consideration of the sum of One Dollar ($1.00), and other good and valuable consideration, the undersigned guarantee the prompt payment at maturity of all notes, drafts, bills of exchange, acceptances and renewals of the same, that may be at any time discounted or purchased by the Mechanics and Metals National Bank of New

York for the account, benefit, or use of the Stockgrowers Bank & Trust Company, of Pocatello, Idaho, or whereon the name of the said Bank appears as maker, drawer, acceptor or endorser, hereby waiving presentment for payment, demand, protest and notice of protest for the non-payment of any such instrument, or the renewal of same.

"This guarantee shall remain in force until written notice of its discontinuance shall be received by the Mechanics and Metals National Bank of New York and until all indebtedness or liability accepted or incurred before receiving notice of the revocation of this guarantee shall have been fully paid. The undersigned shall be severally and jointly liable on this guarantee.

"In Witness Whereof, We have hereunto set our hands and seals at Pocatello, Idaho, this —— day of June, 1920."

This suit is upon this instrument, based upon the claim that it guarantees the payment of the fifty thousand dollar note executed July 29th thereafter which was a renewal in part of a $75,000 note given by the Stockgrowers Bank prior to the execution of the above guaranty. At the time the Stockgrowers Bank executed this note it deposited with appellant collateral notes it had taken from its customers of the face value of $73,855.60.

The complaint, *inter alia,* alleges appellant's corporate existence, that its place of business is in New York City, that the Stockgrowers Bank executed to it the said fifty thousand dollar note, and sets up a copy of the same, it being dated at New York July 29, 1920, payable to the order of appellant in the city of New York. Following the extended terms and conditions contained in the instrument, of some three pages, there follows as a part of it an indorsement which recites that in consideration of one dollar paid to the Stockgrowers Bank and its request for the loan evidenced by the note the undersigned Stockgrowers Bank guarantees to appellant, its successors, indorsee or assigns, the punctual payment at maturity of said loan, and assents to all terms and conditions of the note and consents that the securities for the loan may be exchanged or surrendered

from time to time, or at the time of payment of said loan when extended, without notice to or further assent from the payor, who will remain bound upon this guaranty notwithstanding such exchanges, surrender or extension. Certain credits are admitted and the complaint further alleges that respondents on July 7, 1920, executed the guaranty above set forth, that said guaranty was given to secure this note, and asks judgment against all the guarantors for the unpaid balance of $33,746.14. To this complaint respondents interposed preliminary pleas, all of which were overruled. The amended answer by way of confession and avoidance admits the execution of the principal note, the execution of the guaranty contract, but says that its execution and delivery was a transaction distinct, separate and apart from the giving of the note; that no benefit, advantage or consideration passed to these guarantors by reason of the execution of this guaranty agreement, and as an affirmative defense alleges that there was deposited by the Stockgrowers Bank as collateral to the principal note certain notes held by the Stockgrowers Bank aggregating $73,855.60, setting forth the name of the maker, the amount and the date of maturity of each of said collateral notes; that on December 3, 1920, appellant notified respondents of its intention to sell these collateral notes in New York on the eighth day of December following; that respondents objected to such sale taking place in New York for the reason that the only reasonable market for such notes was in the state of Idaho, but that notwithstanding such objections appellant arbitrarily, wrongfully and in violation of its duties and obligation as pledgee and contrary to the terms of said guaranty agreement, sold all of said notes in New York on December 8, 1920.

It appears that this collateral was sold at public auction by a firm which was regularly engaged in conducting this class of sales, and, so far as the record discloses, these notes were sold in the manner frequently followed in the sale of this class of pledges in the city of New York. That is, a list of the notes with the names of the makers, the

amounts, dates, rates of interest and maturity, was published in an issue of one or more of the New York City papers in the department devoted to financial matters, and afterwards disposed of at public auction at the sale rooms of this auction firm to the highest bidder. The entire amount of collateral deposited by the Stockgrowers Bank was sold and the net amount derived from such sale, after deducting the cost, being $14,938.27, was credited upon this fifty thousand dollar note.

Respondents contend that the makers of these collateral notes were residents of the southeastern part of the state of Idaho where they were all well and favorably known, but were not personally or otherwise known in New York City; that no obligation of any of the makers of said collateral had ever been sold at public or private sale in New York, and that by reason of these facts the sale was unfair and in derogation of respondents' rights as guarantors, if in fact they were liable under the terms of said guaranty contract; that they had no sufficient notice of said sale or opportunity to bid thereat and that such pretended notice was unreasonable and afforded them no opportunity to secure competitive bidding or to secure the bid of any person at such sale who had knowledge of the financial responsibility of the makers of these collateral notes or of the value thereof; that such sale was unfair and in derogation of their rights for the reason that it was not made pursuant to or in a manner authorized by the pledge agreement under which the notes had been deposited by the Stockgrowers Bank as security for its obligation, and that by reason of such wrongful acts this collateral only brought about twenty-five per cent of its real value and that a sale made in the manner that appellant had sold these notes was wrongful and in effect was a conversion of this collateral security in an amount in excess of what the notes were actually sold for, equal to their face value; that such excess exceeds the unpaid balance upon the principal note, and that for these reasons they were not liable upon the guaranty contract for the balance due upon the principal note.

One of the grounds upon which respondents rely, and in view of the conclusion here reached is determinative of the entire controversy, is raised by appellant's twenty-third and twenty-fourth assignments, and may be thus stated: Did the sale of this collateral at public auction in the manner it is admitted to have been sold amount to a conversion of these securities to the extent of the difference between what they sold for and their face value?

The principal note for which this collateral was held provides that upon a breach of any of the conditions named the holder may sell the collateral "at any brokers' board, or at public or private sale, at the option of the Bank, without either demand, advertisement or notice of any kind, all of which are hereby expressly waived." The notice served on respondents in Pocatello, Idaho, December 3, 1920, that this collateral would be sold in New York City December 8th thereafter, stated that such sale would be at public auction.

Appellant bank contends that since the principal note contained the express stipulation that upon its dishonor the pledged collateral might be sold at any brokers' board, or at public or private sale, at the option of the bank, without either demand, advertisement or notice of any kind, all of which were waived, respondents cannot complain because appellant, instead of exercising its option to sell these pledged notes at private sale, which it might have done without giving any notice, if it elected to exercise its option under the agreement to sell at public auction, appellant had a right to sell at public sale upon giving any kind of notice whatever, and that respondents cannot be prejudiced by reason of appellant exercising its option to sell at public sale and giving a notice of sale that was in accordance with the customary method of making such sales, and that in any event the terms of the agreement authorizing the sale of this collateral amount to a complete waiver on the part of respondents of the time, place and manner of sale and only required that a *bona fide* sale of such securities be made. The terms of this agreement as respects a waiver of

all rights of respondent as to the method and manner of sale by appellant of these securities are very comprehensive, but we cannot conclude from this that respondents intended to or did waive all their rights in regard to the manner of the sale of these securities. Similar language to this guaranty is construed in *Union & Mercantile Trust Co. v. Harnwell*, 158 Ark. 295, 250 S. W. 321. The language of the agreement in that case was "at public or private sale . . . . at any place in the city of Little Rock, without notice," and the court said:

"A provision in a pledge that the pledgee could sell the pledged note at public or private sale without notice permits a private sale to be made without notice to the pledgor, but does not mean that, if the pledgee elected to sell at a public sale, no notice of the sale would have to be given to the public, since such a construction would make the contract contradictory within itself, and render it wholly meaningless; so that, if the pledgee chose to sell at public sale, notice of such sale must be given in the usual and customary manner."

The court further observed that while the contract provided that upon nonpayment of the obligation for which this collateral was pledged appellant could sell the pledged note "at public or private sale . . . . at any place in the city of Little Rock, without notice," this language was ambiguous but necessarily meant that if the sale was private it could be without notice to the pledgor; that the parties could not have meant that, if the parties elected to sell at public sale, no notice of the sale would have to be given to the public, and that such a construction of the contract of pledge would render the same contradictory within itself because a public sale could not be conducted unless the public were invited to participate therein, and that such construction would render the same wholly meaningless. It further held that while the pledgor might waive such notice to himself and authorize a private sale, where the contract expressly provided that the sale may be public or private, if the pledgee chooses to make it public, then notice of such

sale must be given in the usual and customary manner for such sales of pledged property, citing 31 Cyc. 878; *Fitzgerald v. Blocher,* 32 Ark. 742, 29 Am. Rep. 3; *Fitzpatrick v. Bank,* 95 Ark. 542, 129 S. W. 795; *Foote v. Utah etc. Bank,* 17 Utah, 283, 54 Pac. 104, which authorities we think support the holding. In the last case it is said:

"Where the officers of a bank are empowered to sell collateral security upon the failure of the maker of the note to comply with its terms and the option is given by which they can dispose of stocks held as security at public or private sale, and they choose to make the sale public, they must conform to the rules governing public sales, so far as publicity is concerned. The power of sale must be exercised with a view to the interests of the pledgor as well as the pledgee."

See, also, *Dulin v. National City Bank* (Ind. App.), 130 N. E. 426; *Amarillo National Bank v. Harrington,* 62 Tex. Civ. 179, 131 S. W. 231.

*Montague v. Dawes,* 14 Allen (Mass.), 373, quoted with approval in *Foote v. Bank, supra,* holds that "One who undertakes to execute a power of sale is bound to the observance of good faith, and a suitable regard for the interests of his principal. He cannot shelter himself under a bare literal compliance with the conditions imposed by the terms of the power. He must use a reasonable degree of effort and diligence to secure and protect the interests of the party who entrusts him with the power."

In *Howard v. Ames,* 3 Met. (Mass.) 311, Chief Justice Shaw said: "Where property, real or personal, is conveyed by a debtor to his creditor with a power to sell and dispose of it, and apply the property to the payment of the debt, the creditor in executing such power becomes the trustee of the debtor, and is bound to act *bona fide,* and to adopt all reasonable modes of proceeding in order to render the sale most beneficial to the debtor, like any other agent, factor or trustee to sell."

These collateral notes sold were held as pledges by appellant, as that term applies to all kinds of personal property,

including negotiable instruments. (31 Cyc. 793; 21 R. C. L. 634; *Cornwell v. Baldwin's Bank,* 12 App. Div. 227, 43 N. Y. Supp. 771; *Valentine v. Donohoe-Kelly Banking Co.,* 133 Cal. 191, 65 Pac. 381; *Jerome v. McCarter,* 94 U. S. 734, 24 L. ed. 136; *Manhattan Sav. Inst. v. New York Nat. Exch. Bank,* 170 N. Y. 58, 88 Am. St. 640, 62 N. E. 1079; *McNary v. Farmers' Nat. Bank,* 33 Okl. 1, Ann. Cas. 1914B, 248, 124 Pac. 286, 41 L. R. A., N. S., 1009.)

This brings us to a consideration of the question as to whether appellant regularly pursued its authority in selling this collateral, upon the record presented by this appeal.

In the absence of any plea or proof to the contrary the laws of the state of New York, with reference to the sale of pledges, must be presumed to be the same as the laws of Idaho. This rule is so well settled that it does not require authority or argument to support it. In *Maloney v. Winston Bros. Co.,* 18 Ida. 740, 111 Pac. 1080, it is so held, and at p. 763 the authorities from most of the jurisdictions in this country are assembled and sustain the holding.

C. S., chapter 239, title 51, entitled "Pledges," secs. 6388 to 6407, provides the manner in which a pledge may be sold. C. S., sec. 6398, reads, "A pledgee must give actual notice to the pledgor of the time and place at which the property pledged will be sold, at such a reasonable time before the sale as will enable the pledgor to attend."

C. S., sec. 6401, provides that "the sale by a pledgee of property pledged must be made at public auction in the manner and upon the notice required upon sale of personal property under execution, and must be for the highest obtainable price."

C. S., sec. 6922, providing for the sale of property under execution, requires that before the sale of property on execution, where the property is not perishable, notice must be given by posting in three public places in the precinct or city where the sale is to take place not less than five nor more than ten days before the time set for such sale, or by publishing a copy thereof at least one week and not more than two weeks in a newspaper published in the county.

40 Idaho—9

If these requirements of the Idaho law with regard to the manner of conducting public sales of pledges are unsuited to business conditions in a metropolitan city, and are not in accordance with the laws of New York governing the sale of pledges, it was incumbent upon appellant to allege and prove that this sale was conducted in a manner authorized by the law of that state. Instead of doing so appellant attempts to justify its action by proving that this was a custom that was widely prevalent in the matter of selling this class of pledges in New York. It is well settled that a custom or usage repugnant to the provisions of a statute is void, and whenever there is a conflict between a custom or usage and a statutory regulation, the statutory regulation must control. (17 C. J. 475; 27 R. C. L. 166; *Basey v. Gallagher,* 20 Wall. (U. S.) 670, 22 L. ed. 452; *Quinnette v. Bisso,* 136 Fed. 825, 69 C. C. A. 503, 5 L. R. A., N. S., 197; *Kohn v. Sacramento Electric etc. Co.,* 168 Cal. 1, 141 Pac. 626; *Ettien v. Drum,* 32 Mont. 311, 80 Pac. 369; *Portland Fish Co. v. Benson,* 65 Or. 147, 108 Pac. 122.)

Respondents contend that a sale of a pledge, as in this case notes of the face value of these notes, which had been executed to the Stockgrowers Bank at Pocatello by its customers who reside in that part of the state, where it appears that they had never transacted business in New York and were wholly unknown there, when the sale is shown to have taken place upon a notice published in one daily paper on the morning of the day of the sale and in another on the evening of the day before, is such a departure from the law for the sale of pledges at public auction that it amounts to a conversion, and that respondents who are sued upon this contract of guaranty may claim a right to be relieved from further liability thereon.

These notes varied in amounts from $5,000 to $19,000 and it is shown that they were sold for $15,050, where their aggregate face value was $73,855.60.

The testimony of Henry J. Leake, offered on behalf of appellant, was to the effect that he was clerk for Adrian H. Muller & Son, stock and bond auctioneers who conducted this sale on December 8, 1920, in New York City; that they

were licensed auctioneers and held this sale at Exchange Sale Rooms, 14–16 Vesey Street, under direction from appellant bank, or its attorney, and gives a detailed statement of the amounts of the several notes sold, with the names of the makers, rates of interest, and dates of maturity. From this it appears that a note of Simon Metche for $4,950 was sold for $100, that a note of Charles Shaw for $13,457.60 was sold for $150. Some of the remaining notes brought a greater per cent of their face value. If the sale of these pledged securities was conducted in conformity to the agreement of the parties pledging such securities and liable upon the principal obligation, the great disparity between the face value of the notes and the amounts for which they sold would not invalidate the sale, and reference is made to such disparity for the purpose of showing why courts give to agreements for the sale of pledges a strict construction.

We think that appellant's election to sell this collateral at public auction was a waiver of its right to sell without notice, and that having so elected to sell at public auction it had no other alternative than to give such notice as the law requires, and that if the law of the state of New York regulating the sale of pledges is different from the law of Idaho prescribing the kind of notice that must be given, appellant should have shown by its pleadings and proof that the sale of these securities was had in accordance with the laws of that state.

While the contract of guaranty sued on in this action contemplates that the liability of the guarantors thereon shall extend to and the contract be performed in New York, it was executed in this state, and we think when sued on here the makers may invoke the well-settled rule of law that in the absence of proof to the contrary the law of that state with respect to the sale of pledges at public auction must be presumed to be the same as the law of this state.

A sale of pledged collateral without a substantial compliance with the requirements of the statute relating to the sale of a pledge amounts to a conversion of such collateral. (31 Cyc. 839; *Whigham v. Fountain,* 132 Ga. 277, 63 S. E.

1115; *Feige v. Burt,* 118 Mich. '243, 74 Am. St. 390, 77 N. W. 928.)

The holder of a promissory note pledged as collateral who sells the same under circumstances that make the sale a conversion is liable to the indorser for the value thereof at the time of sale, which value is *prima facie* the amount of the note when transferred. (*Hazzard et al. v. Duke,* 64 Ind. 221; *Peerless Fire Ins. Co. v. Barcus* (Tex. Civ.), 227 S. W. 368; *Davies v. Stevenson,* 59 Kan. 648, 54 Pac. 679.)

A guarantor is discharged by operation of law from liability by any act on the part of the guarantee which extinguishes the principal contract. (28 C. J. 993; *Central State Bank v. Ford,* 181 Iowa, 319, 164 N. W. 754; *Scandinavian Am. Bank v. Westby,* 41 N. D. 276, 172 N. W. 666; *State Bank v. Edwards,* 45 N. D. 341, 177 N. W. 677.)

The judgment of the court below is affirmed, with costs to respondents.

T. Bailey Lee, District Judge, concurs.

Budge, J., deeming himself disqualified, did not sit.

WM. E. LEE, J., Concurring Specially.—I concur in the conclusion reached by Mr. Justice William A. Lee. The instrument upon which this action was instituted was executed at Pocatello on July 7, 1920, and is without doubt a contract of guaranty. A careful analysis of the instrument discloses that the signers guaranteed the payment of "all notes, drafts, bills of exchange, acceptances, and renewals of the same (1) that may be at any time *discounted or purchased* by the Mechanics and Metals National Bank for the account, benefit or use of the Stockgrowers & Trust Company, of Pocatello, Idaho, or (2) whereon the name of said bank *appears* as maker, drawer, acceptor, or indorser."

It is respondent's contention that the promissory note, payment of which is sought to be enforced against them, is not within the guaranty. It is alleged in the complaint

that the Stockgrowers Bank, for and in consideration of a payment to it of the sum of $50,000, made, executed and delivered the promissory note to the Mechanics & Metals Bank. From this allegation it would seem that the note was an original obligation of the Stockgrowers Bank, and that it was not *"discounted or purchased* by the Mechanics & Metals Bank for the account, benefit or use of the Stockgrowers Bank." An examination of the note discloses that it is a note "whereon the name of said bank (Stockgrowers Bank) *appears* as maker." It bears date, however, of July 29, 1920, while the guaranty is dated July 7, 1920. The name of the Stockgrowers Bank did not appear on the note as maker or otherwise when the guaranty was signed, and respondent contends that for this reason, the note is not within the guaranty. But appellant claims that the evidence shows that the note of July 29, 1920, was a renewal of another note of prior date, which was in existence when the guaranty was signed and which was included within the terms of the guaranty. While it seems apparent that the guaranty covers renewals of notes, etc., *"discounted or purchased* by the Mechanics & Metals National Bank for the account, benefit or use of the Stockgrowers Bank," there is a serious doubt whether the guaranty, by its terms, includes renewals of notes, etc., "whereon the name of said bank (Stockgrowers Bank) appears as maker, drawer, acceptor, or indorser." In view, however, of the conclusion to which I have arrived, I do not deem it necessary to determine this question. Conceding for the purpose of argument that the note was a renewal of another note "whereon the name of said bank [Stockgrowers Bank] appears as maker," and which was within the guaranty, what did the guarantors undertake by the contract of guaranty? They guaranteed "the prompt payment at maturity" of the note; and this was the extent and limit of their liability. The note, of which this note is a renewal, is not in evidence, and the record is silent as to its form or provisions.

The evidence shows that the Mechanics & Metals Bank held considerable additional security for the payment of the

guaranteed indebtedness when the guaranty was signed; and that thereafter additional collateral was delivered by the Stockgrowers Bank to the Mechanics & Metals Bank as security for the payment of the indebtedness, represented by this note. It also appears from the evidence that the Mechanics & Metals Bank surrendered to the Stockgrowers Bank considerable of such security, and that the Mechanics & Metals Bank, without the consent of the guarantors, sold such collateral security, to the extent of the face value of approximately $73,000 in the city of New York. It is earnestly contended by respondents that by the surrender and sale of such collateral the guarantors were released to the extent of the value thereof, and that this value is presumed to be the face value of the collateral (promissory notes) surrendered and sold.

It is a fundamental principle of the law of guaranty that, with respect to additional security for the payment of the debt, the creditor stands in the position of a trustee for the guarantor, and if a creditor surrenders or impairs collateral security without the consent of the guarantor, the latter is released to the extent of such negligent loss, impairment or surrender. (Spencer on Suretyship (Guaranty), secs. 245, 246; De Colyar on Guaranties, p. 438 (2); Stearns on Suretyship, 3d ed., sec. 98; 1 Brandt on Suretyship & Guaranty, 3d ed., sec. 480; 28 C. J. 1007, sec. 169; 12 R. C. L. 1086, sec. 38; *Central State Bank v. Ford,* 181 Iowa, 319, 164 N. W. 754; *Scandinavian American Bank v. Westby,* 41 N. D. 276, 172 N. W. 665.) The Mechanics & Metals Bank sold the collateral, held by it as security for the payment of the fifty thousand dollar note, contrary to law and against the wishes and without the consent of the guarantors. I say "contrary to law" because C. S., sec. 6402, prohibits a pledgee from selling such evidences of debt as constituted the collateral security; and, in the absence of an allegation and proof to the contrary, the law of New York is presumed to be the same as the law of this state. The guarantors expressly objected to the sale of the collateral. The only consent ever given to the sale of the

collateral by the Mechanics & Metals Bank was the consent of the Stockgrowers Bank and was expressed in the promissory note, to which the guarantors were not parties. As to the bank, such consent was effective and constituted a waiver of its right to have the collateral collected and applied on the principal debt. But, as to the guarantors, the situation is entirely different. The contract of guaranty is silent with respect to collateral security, or to a sale or surrender thereof, and it cannot be contended that they ever expressly consented to any sale of the security. Their consent cannot be implied or presumed, for this is not a case where the guarantors stood by and permitted collateral security to be impaired or released, without making any objection. The record shows that the guarantors, as soon as they were notified of the impending sale, informed the Mechanics & Metals Bank that they objected to the sale. The date of the note, which was executed and delivered by the Stockgrowers Bank, was July 29, 1920, while the contract of guaranty bears date July 7, 1920. And even though it be conceded that the contract of guaranty included within its terms the subsequent note, I cannot understand how it can be seriously contended that the guarantors did anything more than to guarantee the payment of the note. It certainly cannot be the law that they, in guaranteeing the payment of the note at maturity, thereby impliedly or otherwise consented to have the collateral security unlawfully disposed of, to their great injury, in violation of law. (C. S., sec. 6402.) A debtor may thus waive his own rights, but he cannot, by agreement with his creditor, waive the rights of one who has guaranteed the payment of his debt. There is no rule for the construction and interpretation of contracts of guaranty that my investigations have disclosed under which a creditor may, without the consent of the guarantor, so release or impair the security for the debt without discharging the guarantor to the extent of the value of the security so released or impaired. Since these guarantors never consented to the sale of the security and it was sold in violation of law and over

their protest, as is so well stated in the opinion of Justice William A. Lee, they were discharged from their obligation.

McCARTHY, C. J., Specially Concurring.—I concur in the opinion of Mr. Justice Wm. E. Lee, except as to respondent Merrill. I am of the opinion that he, having signed the note which provided for the sale of the collateral, is estopped to defend on that ground. To be sure he signed as president of the bank and not in his individual capacity. Nevertheless his act proves knowledge of, and consent to, the terms of the note. He cannot plead individual ignorance of matters which came to his knowledge as president of the bank. From his signing of the note, an implied, if not an express, consent to its terms follows. As to the other respondents, no basis is shown for an estoppel. It is not shown that they approved, or even knew of, the provision of the note providing for sale of the collateral. It may be true that, had they known of it, they might, as directors, have controlled the form of the note, but the consent upon which the claim of estoppel must rest cannot be implied from that fact alone.

Dunn, J., dissents.